24CA2274 Marriage of Danis 01-08-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA2274
Arapahoe County District Court No. 12DR2914
Honorable Kevin Sidel, Judge

In re the Marriage of

John Marcel Danis,

Appellant,

and

Brooke Annette Danis n/k/a Brooke Annette Greene,

Appellee.

JUDGMENT AFFIRMED,
ORDERS AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE LIPINSKY
Dunn and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 8, 2026

Griffiths Law PC, Christopher Griffiths, Anthony J. Zarsky, Kimberly A. Newton, Lone Tree, Colorado, for Appellant

Driskell & Ray, LLC, Scott Ray, Denver, Colorado, for Appellee

¶ 1    John Marcel Danis (husband) appeals the district court's order finding him in remedial contempt for underpaying maintenance to his ex-wife, Brooke Annette Greene (wife), and imposing remedial contempt sanctions; denying his motion to terminate or modify maintenance (the motion to modify); and setting the amount of husband's maintenance obligation from July 14, 2023, through the conclusion of the fifteen-year maintenance term. We affirm in part and reverse in part, as explained below.

## I.    Background

¶ 2    After filing a joint petition for dissolution of marriage, husband and wife participated in a mediation that culminated in their execution of a "Memorandum of Understanding" (the MOU) in November 2012. The MOU includes a provision specifying the formulas for calculating the amount of husband's maintenance payments to wife (the maintenance provision) over the next fifteen years (the maintenance term).

¶ 3    The maintenance provision identifies three discrete "maintenance period[s]." During each period, the amount of husband's maintenance payments is calculated using a variation of

the same basic formula: adding a specified percentage of his "gross salary" to a specified percentage of his "gross bonus" (the formula).

¶ 4     The court incorporated the MOU into its decree of dissolution of marriage.  The MOU thus became a court order.

¶ 5     Consistent with the maintenance provision, husband began paying wife maintenance in January 2014.  Although husband complied with wife's request to provide her with his 2014 W-2 for tax purposes, over the next six years, husband disregarded wife's requests for his W-2s and other income information.

¶ 6     In 2020, wife obtained information regarding husband's income as part of a mortgage refinancing.  Upon reviewing that information, wife concluded that husband had underpaid maintenance for several years.

¶ 7     In August 2022, wife filed a motion for a contempt citation (the contempt motion) against husband based on his alleged underpayment of maintenance from 2014 through 2022 (the underpayment period).  Four months later, wife filed a motion to compel husband to produce information regarding his gross salary and gross bonuses, which the court granted in May 2023.

¶ 8    On July 14, 2023, husband filed the motion to modify, in which he asked the court to terminate his maintenance obligation or modify it to "a set figure" to "reduce conflict" because, according to husband, the parties had intended that wife receive "a steadily decreasing amount of monthly spousal maintenance." One year later, wife filed an amended contempt motion, in which she specified the amount of unpaid maintenance husband allegedly owed her for each year during the underpayment period.

¶ 9    On October 1, 2024, the court conducted a hearing (the October hearing) on the contempt motion and husband's motion to modify.

¶ 10   One month later, the court issued a written order (the November order) in which it found, as relevant to this appeal, that

- husband had correctly calculated the amount of maintenance from 2014 through 2017 and from January 1, 2018, through September 4, 2018, when husband began working for a company called Wheel Pros;

- husband, after receiving an August 31, 2018, offer letter from Wheel Pros (the offer letter), asked Wheel Pros to

shift a portion of his compensation described in the offer letter from salary and bonuses to new income categories;

- husband requested this shift to lower the gross salary and gross bonuses he received from Wheel Pros and, thereby, to reduce his maintenance payments to wife;

- the shift did not change his total compensation from Wheel Pros; and

- husband provided no evidence of the gross salary or gross bonuses (if any) he received from Wheel Pros.

The court concluded that "husband's actions were an obvious manipulation of his pay to reduce maintenance" for 2019, 2020, and 2021.

¶ 11 Based on its finding that husband had manipulated his pay structure, the court used the numbers in the offer letter to calculate husband's gross salary and gross bonuses for 2019 through 2021. After making this calculation, the court found that husband owed wife $207,054 in unpaid maintenance from 2014 through 2022. In addition, the court found husband in remedial contempt and sanctioned him by ordering him to provide wife with his tax returns and other documentation of his income for the remainder of the

maintenance term and pay wife the attorney fees and costs she incurred in connection with the contempt motion.

¶ 12     In addition, the court rejected husband's request for termination or modification of his maintenance obligation. (Husband does not appeal the court's denial of his termination request.)  As explained further below, the court found that husband was "voluntarily unemployed" at the time of the October hearing and explained that voluntary unemployment "cannot be the basis for modification of maintenance."

¶ 13     Wife did not file her own motion for modification of maintenance.  In the contempt motion, she addressed husband's underpayment of maintenance for the underpayment period but did not ask the court to determine the amount of maintenance husband owed after the underpayment period.  But at the October hearing and in her written closing argument following the hearing, wife asked the court to modify the maintenance provision and determine the amount of maintenance husband owed through the conclusion of the fifteen-year maintenance term.

¶ 14     In response to wife's request for determination of husband's maintenance obligation following the underpayment period, in the

5

November order, the court specified the amount of husband's monthly maintenance obligation for the period from July 14, 2023 (the date husband filed the motion to modify), through October 31, 2024 (the 2023-24 maintenance period), and fixed husband's maintenance obligation at $8,347 per month from November 1, 2024, through the end of the maintenance term.

¶ 15    To determine husband's gross salary and gross bonuses for these time periods, the court looked to his average gross salary and gross bonuses for 2017 through 2021.  The court said those figures were "representative of husband's recent earning ability."

¶ 16    On December 10, 2024, wife filed a verified entry of support judgment, in which she sought a judgment against husband in the amount of $116,741.85 — his total unpaid maintenance for July 14, 2023, through December 9, 2024.  The court granted wife's request and entered a judgment against husband in such amount (the judgment) on December 23, 2024.

¶ 17    On appeal, husband contends that the court (1) erred by finding him in remedial contempt and entering remedial contempt sanctions against him; (2) abused its discretion by denying husband's motion to modify; and (3) erred by calculating the

6

amount of maintenance from the conclusion of the underpayment period through the end of the maintenance term.

## II.    Analysis

### A.    The Court Did Not Err by Finding Husband in Remedial Contempt or Imposing Sanctions under C.R.C.P. 107

#### 1.    Standard of Review

¶ 18    "A contempt finding is within the discretion of the district court and will not be reversed absent an abuse of discretion." *In re Marriage of Sheehan*, 2022 COA 29, ¶ 23, 511 P.3d 708, 715.  We must accept a district court's factual determinations regarding contempt unless they lack record support or are clearly erroneous. *In re Marriage of Webb*, 284 P.3d 107, 108-09 (Colo. App. 2011).  "A court's finding of fact is clearly erroneous if there is no support for it in the record." *Gagne v. Gagne*, 2019 COA 42, ¶ 17, 459 P.3d 686, 692.

¶ 19    "A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it is based on a misapplication of the law." *Sheehan*, ¶ 23, 511 P.3d at 715.  In considering whether a court's decision is manifestly unreasonable, arbitrary, or unfair, we ask whether the decision "fell within a range

of reasonable options" and review whether it was based on credible evidence and did not "exceed[] the bounds of the rationally available choices." *Churchill v. Univ. of Colo.*, 2012 CO 54, ¶ 74, 285 P.3d 986, 1008 (first quoting *E-470 Pub. Highway Auth. v. Revenig*, 140 P.3d 227, 230-31 (Colo. App. 2006); and then quoting *Hall v. Moreno*, 2012 CO 14, ¶ 54, 270 P.3d 961, 974).

### 2.    Substantive Law

¶ 20    A court may hold a party in contempt for "disobedience or resistance . . . to or interference with any lawful . . . order of the court." C.R.C.P. 107(a)(1). Remedial contempt seeks to force compliance with a lawful court order. C.R.C.P. 107(a)(5).

¶ 21    Remedial contempt sanctions "must be supported by findings of fact establishing the contemnor (1) did not comply with a lawful order of the court; (2) knew of the order; and (3) has the present ability to comply with the order." *In re Marriage of Cyr*, 186 P.3d 88, 92 (Colo. App. 2008). "The burden of proving inability to comply with the order rests on the alleged contemnor." *Id.* When imposing remedial contempt sanctions, a court must "enter an order in writing or on the record describing the means by which the person

8

may purge the contempt and the sanctions that will be in effect until the contempt is purged." C.R.C.P. 107(d)(2).

¶ 22    Thus, in this case, we review whether the court made findings, with record support, that husband (1) did not comply with the maintenance provision during the underpayment period; (2) knew of the maintenance provision; and (3) had the present ability to comply with it. *See Sheehan,* ¶¶ 23, 25, 511 P.3d at 715-16; *Webb,* 284 P.3d at 108-09; *Cyr,* 186 P.3d at 91-92.

### 3.    The Court Did Not Abuse Its Discretion by Finding Husband in Remedial Contempt

¶ 23    In the November order, the court found that, during the underpayment period, husband did not pay wife the full amount of maintenance to which she was entitled under the maintenance provision, which was a court order; knew of the maintenance provision; and had the present ability to comply with it.

#### a.    The Court Did Not Err by Finding that Husband Did Not Comply with the Unambiguous Maintenance Provision

¶ 24    The court specifically found that husband manipulated the categories of compensation he received from Wheel Pros — he "set out to renegotiate and re-characterize his compensation

9

package . . . to minimize his salary and bonus income for the purpose of reducing maintenance he would owe to wife" during the time he worked at Wheel Pros.

¶ 25 The offer letter says that Wheel Pros would pay husband a base salary of $310,000 and "an annual performance-based bonus with a target of 50% of [his] base salary." The offer letter also provides that "Wheel Pros would pay husband 50%" of the bonus he would have received had he remained at his prior employer. The same day husband received the offer letter, he sent wife an email saying that Wheel Pros had "offered a lower base pay at $220,000 and a bonus at 30 percent."

¶ 26 Less than one month later, the compensation numbers in the offer letter changed at husband's request. In a letter dated September 18, 2018 (the September letter), Wheel Pros said that husband's "final compensation package" consisted of an annual salary of only $220,000 and a target bonus of 25% to 30% of his base salary. (The record is not clear as to this percentage amount. The specific number is not relevant to our analysis, however.) According to the September letter, husband's total compensation from Wheel Pros would remain at $310,000, although $90,000 of

his base salary would be shifted to four new income categories — a car allowance, tax equalization, dual household expense allowance, and travel expense allowance. The chief executive officer of Wheel Pros later said in an affidavit that husband had asked Wheel Pros to change his compensation structure to shift a portion of his base salary to the new categories documented in the September letter.

¶ 27    The new categories of income, together with his September base salary, totaled $310,000 — not coincidentally, the same amount of base salary referenced in the offer letter. The court found that "[h]usband's actions were an obvious manipulation of his pay to reduce maintenance. There was no other explanation provided why husband sought to reclassify aspects of his income to these new categories and all of the categories husband negotiated appear to have been taxed as regular income." The record supports these findings.

¶ 28    Husband nonetheless contends that the court erred by holding him in contempt because the terms "gross salary" and "gross bonus" in the maintenance provision are ambiguous. Husband argues that, because the terms are ambiguous, he reasonably interpreted them when he calculated the amount of his

maintenance payments during the underpayment period, and the court should have construed the ambiguities in his favor.

¶ 29　Husband relies on a single case to support his argument — *People v. Kriho*, 996 P.2d 158, 173 (Colo. App. 1999).  But *Kriho* involved a "juror contempt prosecution" and does not stand for the proposition that a court must construe ambiguities *in a court order* in favor of a contemnor.  *Id.*

¶ 30　We review de novo whether a contract is ambiguous.  *Gagne v. Gagne*, 2014 COA 127, ¶ 50, 338 P.3d 1152, 1163.  "In determining whether a provision in a contract is ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the agreement's provisions." *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990).  A provision is ambiguous if it is fairly susceptible to more than one interpretation.  *Dorman v. Petrol Aspen, Inc.,* 914 P.2d 909, 912 (Colo. 1996).

¶ 31　Husband is correct that the maintenance provision does not define "gross salary" or "gross bonus."  But "a term is not

ambiguous solely because it is not defined." *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1061 (Colo. 2005).

¶ 32    Husband further argues that "gross salary" and "gross bonus" are presumptively ambiguous because he and wife interpret them differently. But a definitional dispute also does not create ambiguity. *See Dorman*, 914 P.2d at 912 ("[T]he mere fact that the parties differ on their interpretations of an instrument does not of itself create an ambiguity." (quoting *Kylberg*, 799 P.2d at 374)).

¶ 33    Significantly, "gross," "salary," and "bonus" have common meanings. "Gross" means "an overall total exclusive of deductions (as taxes, expenses)." *Ringquist v. Wall Custom Homes, LLC*, 176 P.3d 846, 850 (Colo. App. 2007) (quoting Webster's Third New International Dictionary 1002 (1986)); *see* Black's Law Dictionary 843 (12th ed. 2024). A "[s]alary" is "a fixed annual or periodical payment for services," *Div. of Emp. & Training v. Moen*, 767 P.2d 1230, 1233 (Colo. App. 1988) (quoting *Home Beneficial Life Ins. Co. v. Unemployment Comp. Comm'n*, 27 S.E.2d 159, 163 (Va. 1943)), or "[a]n agreed compensation for services . . . paid at regular intervals on a yearly basis," Black's Law Dictionary 1607 (12th ed. 2024). And a "bonus" is defined as "[a] premium paid in addition to what is

due or expected" or "a payment by way of division of a business's profits, given over and above normal compensation." Black's Law Dictionary 224 (12th ed. 2024); *see also, e.g., Bukuras v. Mueller Grp., LCC,* 592 F.3d 255, 262 (1st Cir. 2010) (defining "bonus" per its "plain and ordinary" meaning as "any additional funds over and above [a] salary").

¶ 34 Combining "gross" with "salary" and "bonus" indicates that the formula requires calculation of the amount of husband's maintenance payments based on his total salary and total bonus, without any adjustment. *See Ringquist,* 176 P.3d at 850; Black's Law Dictionary 843 (12th ed. 2024).

¶ 35 The maintenance provision provides an example of how husband's maintenance payments are to be calculated as of the date of the MOU. The example specifies that, for the first maintenance period, husband would pay wife 35% of his gross salary, which "currently equals $4,813.00 per month." Husband contends that, "[u]nder the plain language of the MOU," the $4,813.00 maintenance amount is an "initial baseline" that "serves as a presumptive ceiling or guidepost for future payments." But the use of "currently" in the MOU indicates the parties' recognition that

14

husband's gross salary was likely to fluctuate throughout the maintenance term; "currently" means "at the present time." Merriam-Webster Dictionary, https://perma.cc/4MXU-YH4U. The MOU does not refer to a "presumptive ceiling" or "guidepost." Thus, the $4,813.00 figure is merely illustrative.

¶ 36 Nothing in the maintenance provision — or anything else in the MOU — indicates that the meanings of these terms as they are used in the maintenance provision deviate from their common meanings. Regardless of husband's efforts to manipulate the categories of his compensation, the new income categories in the September letter still comprised "agreed compensation for services . . . paid at regular intervals." Husband could not evade his maintenance obligation by affixing new labels to portions of the gross salary and gross bonuses he received from Wheel Pros.

¶ 37 Furthermore, the court found that husband paid the correct amount of maintenance from 2014 through 2017 — nearly one-third of the maintenance term — even though, during that time, the amounts of his gross salary and gross bonuses fluctuated. Husband's compliance with the maintenance provision for four

years demonstrates that he understood the meanings of "gross salary" and "gross bonus."

¶ 38 For these reasons, we conclude that the terms "gross salary" and "gross bonus" in the maintenance provision are unambiguous.

### b. The Court Did Not Err by Finding that Husband Knew of the Maintenance Provision and Had the Present Ability to Comply with It

¶ 39 Moreover, the court found that husband knew the terms of the maintenance provision. The undisputed evidence showed that he signed the MOU and fully complied with it for the first four years of the fifteen-year maintenance term. The parties acknowledged in the MOU that "each has read *and understands* this Agreement, that it represents their Agreement, *and that they believe it is fair* and not unconscionable in all its terms." (Emphasis added.)

¶ 40 In addition, the court found in the November order that "husband had the present ability" to pay the correct amount of maintenance he owed wife during the underpayment period. Although husband was unemployed at the time of the October hearing, a sworn financial statement he submitted to the court in September 2024 showed that husband owned $2,472,140.21 in assets — a sufficient sum to enable him to purge the portion of the

16

contempt sanction requiring him to pay wife $207,054 in unpaid maintenance. Thus, the record supports the court's finding that husband was in contempt for underpaying maintenance.

¶ 41 We therefore hold that the court did not abuse its discretion by finding husband in remedial contempt and imposing sanctions against him.

### c. The Court Did Not Hold Husband in Contempt Based on a Modification of the Maintenance Provision

¶ 42 In addition, husband contends that the court erred by finding him in contempt only after it retroactively modified the maintenance provision. According to husband, the court modified the maintenance provision when it calculated his maintenance obligation, not based on husband's actual gross salary and gross bonuses, but instead based on the income the court "believe[d] he *should* have earned" from Wheel Pros. Husband asserts that he had no way of knowing that the court would retroactively change the maintenance provision years after he made maintenance payments in reliance on the original provision.

¶ 43 We disagree that the court held husband in contempt premised on a modified version of the maintenance provision.

Husband asserts that the court improperly imputed income to him to calculate his maintenance obligation for the time he worked at Wheel Pros. We reject this argument because the court's calculation of that maintenance obligation was based on husband's actual gross salary from Wheel Pros, without regard to husband's attempt to recharacterize portions of his gross salary as other forms of income. A court "imputes" income when it attributes income to the payor spouse that the payor never actually received. *See, e.g.*, *In re Marriage of Gibbs*, 2019 COA 104, ¶ 20, 446 P.3d 968, 971 (describing imputed income as "potential" or "[u]nrealized" income).

¶ 44    The evidence showed that husband earned at least the amount of compensation from Wheel Pros that the court attributed to him. Husband argues the court "repeatedly rejected actual W-2 evidence" and used amounts husband "never earned" to determine husband's gross salary and gross bonuses during his employment at Wheel Pros. Husband's W-2s, which do not distinguish between gross salary and gross bonus, show that husband earned *more* money from Wheel Pros than the $310,000 the court used to calculate his unpaid maintenance. Furthermore, husband provided no other evidence of the actual gross salary or gross bonuses he received

18

from Wheel Pros. That husband elected to shift his total compensation into categories other than gross salary and gross bonus does not mean he did not earn it or that the court imputed salary income to him.

¶ 45 As noted above, the terms "gross salary" and "gross bonus" in the formula are not ambiguous. A court interprets an unambiguous contract by "ascertain[ing] and implement[ing] the intent of the parties" and generally affording the "words in [the] contract their plain meaning." *Johnson Nathan Strohe, P.C. v. MEP Eng'g, Inc.*, 2021 COA 125, ¶ 12, 501 P.3d 826, 829 (quoting *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 11, 292 P.3d 934, 937).

¶ 46 The court properly applied the formula when it calculated the amount of husband's maintenance payments for the underpayment period. Based on its findings that husband manipulated his income categories when he worked at Wheel Pros, and that he provided no evidence of his actual gross salary and gross bonuses during that time, the court possessed the discretion to determine the correct amount of husband's actual gross salary and gross bonuses when he was a Wheel Pros employee.

¶ 47      In calculating husband's maintenance payments for the underpayment period, the court did not modify the maintenance provision because, as the court noted, the maintenance provision "clearly states that wife will receive a percentage of husband's 'gross salary' and a percentage of husband's 'gross bonus.'" The court explained that, but for husband's reclassification of his income categories as reflected in the September letter, Wheel Pros would have divided his compensation between gross salary and gross bonuses as specified in the offer letter. The court then applied the gross salary and gross bonus figures that appeared in the offer letter, so the amount of husband's maintenance payments during the underpayment period would not be premised on manipulated numbers.

¶ 48      Therefore, the court's calculation of maintenance for the underpayment period did not represent a modification of the maintenance provision but, rather, a determination of husband's underpayment of maintenance premised on the most accurate available gross salary and gross bonus figures. For these reasons, the court did not err by holding husband in contempt after

determining that he manipulated the categories of compensation he received from Wheel Pros to underpay maintenance.

¶ 49 For these reasons, we affirm the judgment finding husband in remedial contempt and imposing remedial sanctions. And we affirm the portion of the November order ordering him to pay $207,054 in unpaid maintenance.

### B. The Court Did Not Abuse Its Discretion by Denying Husband's Motion to Modify

¶ 50 Husband argues that the court erred by modifying the maintenance provision and then, inconsistently, denying husband's motion to modify. As explained above, *see supra* Part II.A.3.c, we disagree with husband's assertion that the court modified the maintenance provision to calculate the amount of maintenance he owed during the underpayment period. For that reason, we need not further consider this argument in the context of the court's denial of husband's motion to modify.

¶ 51 Next, husband challenges the court's determination that he was not entitled to modification of his maintenance obligation because he was voluntarily unemployed at the time of the October hearing. He asserts that he was not shirking his maintenance

obligation by choosing not to work.  We disagree that the court erred.

### 1. Standard of Review

¶ 52    We review an order denying a modification of maintenance for an abuse of discretion.  *In re Marriage of Young*, 2021 COA 96, ¶ 7, 497 P.3d 524, 528.  For the reasons noted above, *supra* Part II.A.1, this is a "highly deferential" standard of review.  *Jackson v. Unocal Corp.*, 262 P.3d 874, 879 (Colo. 2011).

### 2. Substantive Law

¶ 53    A party seeking modification of maintenance must demonstrate "changed circumstances so substantial and continuing as to make the existing terms unfair."  *Young*, ¶ 12, 497 P.3d at 528 (quoting § 14-10-122(1)(a), C.R.S. 2020).  The moving party bears a "heavy burden" of proving that the maintenance order's provisions have become "unfair under all relevant circumstances."  *Id.*

¶ 54    We will not disturb a court's findings supporting a determination that a party is voluntarily unemployed or underemployed unless the court's determination is not supported by the record and, therefore, is clearly erroneous.  *In re Marriage of Bregar*, 952 P.2d 783, 785 (Colo. App. 1997).  When determining if

a party is voluntarily unemployed, a court may consider that party's efforts to find new employment and available positions for which the party is qualified. *See id.* at 785-86. "A payor spouse whose income is reduced or terminated due to his or her retirement after reaching full retirement age is entitled to a rebuttable presumption that the retirement is in good faith." § 14-10-122(2)(b), C.R.S. 2025. "[F]ull retirement age" means "the payor's usual or ordinary retirement age when he or she would be eligible for full United States social security benefits, regardless of whether he or she is ineligible for social security benefits for some reason other than attaining full retirement age." § 14-10-122(2)(c).

¶ 55    This statutory rebuttable presumption "is not conclusive on the question of whether the court should terminate the payor's maintenance obligation." *In re Marriage of Thorstad,* 2019 COA 13, ¶ 36, 434 P.3d 165, 172, *superseded by statute on other grounds,* Ch. 176, sec. 1, § 14-10-114(5), 2013 Colo. Sess. Laws 648. "[I]f a payor [spouse] asks a court to modify or to terminate a maintenance obligation because he or she intends to retire, then the court should follow a general rule." *Id.* at ¶ 43, 434 P.3d at 173. Under the general rule, the court must first decide whether

23

"the payor's decision to retire was made in good faith" and, second, "incorporate its findings concerning the payor's decision to retire as one of the factors to consider in deciding whether, under [section § 14-10-122(1)(a)], circumstances have changed in such a substantial and continuing way as to make the original order unfair." *Id.*

### 3. Husband's Arguments Regarding Voluntary Unemployment

¶ 56 Husband argues that, under the maintenance provision, the court was required to grant husband's motion to modify because he had retired and was therefore unemployed. He points to the language of the maintenance provision specifying that, "[i]f husband's compensation structure changes, the maintenance terms shall be modified with the intent to achieve a comparable result."

¶ 57 Although there was no dispute that husband was unemployed, the court found he was *voluntarily* unemployed. A party may not shirk a maintenance obligation by choosing not to work. *See Young*, ¶ 22, 497 P.3d at 530. (Because husband was fifty-seven when the court entered the November order, he was not entitled to the statutory rebuttable presumption that he had retired in good faith. *See* § 14-10-122(2)(b).)

¶ 58    The court reached this conclusion after considering whether husband had decided in good faith to retire (or otherwise not to work).  *See Thorstad*, ¶ 38, 434 P.3d at 172.  "[G]ood faith" in this context means that the spouse's decision not to work was "not primarily motivated by a desire to decrease or eliminate maintenance" and was "objectively reasonable based on factors such as the obligor's age, the obligor's health, and the practice of the industry in which the obligor was employed."  *In re Marriage of Swing*, 194 P.3d 498, 501 (Colo. App. 2008).

¶ 59    The court found that husband did not intend to seek further employment; he did not seek a job comparable to the positions he held before 2022 because they required international travel that, he said, adversely impacted his relationships and his health; and he had talked about retiring after leaving Wheel Pros in 2022.  Husband testified that he took a job with JM Contracting in 2022 at a salary of $80,000 per year — an approximately $230,000 annual salary reduction — and that he stopped working altogether in June 2023.

¶ 60    But the court also found there was no evidence

- indicating that "husband ha[d] looked for a job consistent with his previous employment with [his employer before Wheel Pros] and Wheel Pros since he left Wheel Pros early in 2022 or even a job that would pay husband less"; or

- suggesting that "husband had sought employment in a different field to avoid his previous travel, or to focus on a relationship, or even for his fulfillment."

In other words, the court found that husband had not undertaken a good faith search for a new position that did not require international travel or otherwise negatively impact his relationships and health.

¶ 61 After examining the relevant evidence, the court concluded that "husband had simply chosen not to seek employment" and observed that "[h]usband's choice not only would unduly diminish his support to wife" but that, under husband's theory, "his support would be eliminated as he would have no salary or bonus to share."

¶ 62 We may not reweigh the court's assessment of the facts, and we cannot say that the record does not support the court's findings. *See In re Marriage of Rahn*, 914 P.2d 463, 465 (Colo. App. 1995). Thus, the court's finding that husband was voluntarily unemployed

was not clearly erroneous, and the court did not abuse its discretion by denying husband's motion to modify after finding that he *chose* not to work. We therefore affirm the portion of the November order denying the motion to modify.

### C. We Reverse the Court's Order Regarding Husband's Maintenance Obligations On and After July 14, 2023

¶ 63 Husband further argues that the court impermissibly modified the maintenance provision when it determined the amount of maintenance he owed on and after July 14, 2023 (the date husband filed the motion to modify), and ordered him to pay a fixed monthly amount of maintenance from November 1, 2024, through the end of the maintenance term (the fixed maintenance period). He also asserts that the court erroneously expanded the scope of the contempt proceeding by ordering him to pay $116,741.85 in maintenance for the 2023-24 maintenance period.

¶ 64 As we explain further below, the court's findings and statements regarding its calculation of husband's maintenance obligation on and after July 14, 2023, were contradictory at worst and unclear at best. We are unable to discern from the November order whether, by ordering husband to pay specified maintenance

27

amounts during the fixed maintenance period, the court believed it was modifying the maintenance provision or merely enforcing the maintenance provision by plugging *imputed* gross salary and gross bonus figures into the formula. Because the record does not reveal the rationale for the court's calculation of husband's maintenance obligations from July 14, 2023, through the conclusion of the maintenance term, we reverse the portion of the November order setting such maintenance amounts and remand to the court for further proceedings consistent with this opinion.

### 1.    Additional Facts

¶ 65    Although wife had not asked the court before the October hearing to determine the amount of maintenance that husband owed for the remainder of the maintenance term, at the hearing, wife testified that the court "need[ed] to determine how much [husband was] making" and "how much [he was] able to make" and "set up . . . a payment for an X amount of money, determining what would be appropriate for his income" for the remainder of the maintenance term. Similarly, in wife's written closing argument, her counsel asked the court to modify maintenance to "complete the 15-year term of maintenance, ending in December 2028, in the

28

monthly amount of $11,069 per month. This is the average amount of monthly maintenance that [w]ife *should have* received between the years of 2014 and 2022 had all of [h]usband's [W-2] income been used." But wife did not point to "changed circumstances so substantial and continuing" that they made the maintenance provision "unfair" — the statutory standard for modification of maintenance awards. § 14-10-122(1)(a).

¶ 66     In the November order, the court acknowledged that "[w]ife requests the [c]ourt modify the remaining term of maintenance to a set monthly amount" and that "[h]usband took a similar position." The court said that, because it "ha[d] not modified the current orders concerning maintenance," it *could not* "enter the type of order suggested by the parties" by setting a monthly amount. The court "recognize[d] that following the current orders/formula [could] lead to continued disagreements between the parties and litigation concerning the calculation of maintenance" but that the parties could "modify their agreement at any time to create a new maintenance arrangement." After making these pronouncements, however, the court proceeded to determine the amount of maintenance that husband owed on and after July 14, 2023.

¶ 67    To calculate the amount of husband's future maintenance payments, the court plugged into the formula husband's average salary and bonuses for 2017 through 2021, which the court imputed to husband based on its finding that he was voluntarily unemployed. The court specified that husband owed wife "$45,908.00 for maintenance for July 14, 2023[,] through December 31, 2023"; he owed her "$83,470.00 for maintenance for January 1, 2024[,] through October 31, 2024" (four days before the court entered the November order); and he "continue[d] to owe current maintenance of $8,347 per month."

¶ 68    The court said that, "[i]n determining these figures and applying these figures," it "ha[d] not modified maintenance but ha[d] simply applied the existing formula to the imputed income." But then it seemingly contradicted itself by saying, "Although the [c]ourt has authority to impute income and apply the parties' formula, the [c]ourt does not have the authority based on the contents of the pending *Motion to Modify* and pending [c]ontempt to enter orders concerning payment(s) during 2023" and "from 2024."

¶ 69    The amount of the money judgment that wife sought in the verified entry of support judgment — $116,741.85 — was based on

the maintenance figures in the November order. On December 23, 2024, the court entered a money judgment in favor of wife in the amount she requested.

### 2. The Court's Calculation of Maintenance from July 14, 2023, Through the End of the Maintenance Term

¶ 70 Husband contends the court "effectively rewr[ote]" the maintenance provision when it imputed a gross salary and gross bonus to him "[e]ffective July 14, 2023," and ordered that husband "continues to owe current maintenance of $8,347.00 per month" through the end of the maintenance term. Although the court asserted that it did "not modify maintenance" by applying "the existing formula to the imputed income," we cannot tell whether the court modified the maintenance provision when it ordered husband to pay $8,347.00 in monthly maintenance from July 14, 2023, through the conclusion of the maintenance term. The court did not make a finding that it could order husband to pay a fixed monthly maintenance amount for the remainder of the maintenance term without modifying the maintenance provision.

¶ 71 We do not take issue with the court's general statements regarding imputed income. We agree with the court that, when a

31

party is voluntarily unemployed, the court may impute income to that party to calculate maintenance. *See In re Marriage of Tooker*, 2019 COA 83, ¶¶ 25-27, 444 P.3d 856, 861 (holding that if a party is voluntarily unemployed maintenance is based on the party's potential income, which a district court has broad discretion in determining); § 14-10-114, C.R.S. 2025. We also find no error in the court's method of imputing income to husband. *See Tooker*, ¶ 26, 444 P.3d at 861 ("'Potential income' is . . . the amount a party could earn from a full-time job commensurate with the party's demonstrated earning ability. In determining potential income, the district court may consider several factors, including the party's historical income, education, and work experience." (citation omitted)); *In re Marriage of Capparelli*, 2024 COA 103M, ¶¶ 32-35, 561 P.3d 417, 425 ("In situations where a party's income fluctuates or there is conflicting evidence regarding the income amount, the district court may, in its discretion, consider and use an average of the party's past income."). But the court left unresolved the fundamental question of whether it needed to modify the maintenance provision before it could calculate husband's

maintenance obligation based on imputed gross salary and gross bonus amounts that he never received.

¶ 72    Wife argues on appeal that the court merely interpreted and enforced the maintenance provision when it inserted the imputed income figures into the formula to calculate husband's maintenance obligation from July 14, 2023, through the conclusion of the maintenance term.  But wife requested a modification at the October hearing and when she filed her written closing argument. She apparently believed that, to award such maintenance amounts, the court needed to modify the maintenance provision.

¶ 73    In addition, the parties do not point to, the court did not cite, and we are unaware of any reported Colorado case holding that a court may impute income to a spouse outside the context of an initial award or modification of maintenance.  *See, e.g., Capparelli*, ¶ 27, 32, 561 P.3d 424-25 (averaging a party's past income to calculate maintenance for permanent orders); *Tooker*, ¶¶ 23-39, 444 P.3d at 861-63 (addressing imputed income in the context of adjudicating a motion to modify maintenance).

¶ 74    Accordingly, we reverse the portion of the November order setting husband's maintenance obligation on and after July 14,

2023, and remand for consideration of whether the court could (1) award such maintenance without modifying the maintenance provision; (2) award a fixed monthly amount of maintenance during the fixed maintenance period without modifying the maintenance provision; and (3) whether wife established the statutory grounds for modifying maintenance if modification of the maintenance provision was required before the court could set such maintenance amounts.

## III.  Disposition

¶ 75    The judgment finding husband in remedial contempt and imposing remedial sanctions is affirmed.

¶ 76    The November order is affirmed in part and reversed in part. The portions of the November order ordering husband to pay wife $207,054 in unpaid maintenance and denying the motion to modify are affirmed.

¶ 77    The portions of the November order addressing maintenance from July 14, 2023, forward are reversed.  Accordingly, the order for the December money judgment is also reversed.  The case is remanded to the court for further proceedings consistent with this opinion.

34

JUDGE DUNN and JUDGE KUHN concur.